IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **WARREN WEST,** : | |
| : | |
| **Plaintiff,** : | |
| : | **CIVIL ACTION** |
| v. : | |
| : | **NO. 11-1194** |
| **CITY OF BETHLEHEM ET AL.,** : | |
| : | |
| **Defendants.** : | |

**MEMORANDUM AND ORDER**

**Tucker, J.**                                                                                                   **October \_\_\_, 2011**

      Presently before the Court are Defendants' Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(6) (Doc. 6) and Plaintiff's Response in Opposition thereto (Doc. 8). Upon careful consideration of the parties' submissions and for the reasons set forth below, Defendants' Motion will be granted in part and denied in part.

**I.    FACTUAL BACKGROUND**

      Plaintiff Warren West ("Plaintiff") has brought this action against the City of Bethlehem ("City" or "Bethlehem") and Ralph Carp ("Carp") for alleged racial discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 1983, and the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. § 951. Plaintiff originally included a 42 U.S.C. § 1981 claim against Defendants but filed an Amended Complaint eliminating the § 1981 claim in response to Defendants' previous Motion to Dismiss. In his Amended Complaint Plaintiff specifically asserts race discrimination and a hostile work environment in violation of Title VII of the Civil Rights Act and violation of his constitutional right to equal protection under the Fourteenth Amendment pursuant to 42 U.S.C. § 1983.

      The facts construed in the light most favorable to Plaintiff are as follows. Plaintiff was hired by

Defendant Bethlehem as a janitor in the Parks and Recreation Department ("Department") in January 2009. (Amended Complaint ¶ 9.) Carp was the Director of Parks and Recreation and his prejudice against African Americans and Hispanics was well known. (Id. at ¶ 12.) Plaintiff is an African American and one of only two African American employees at the Parks and Recreation Department. (Id. at ¶¶ 7, 10.) Plaintiff was only able to obtain employment with the Parks and Recreation Department with the assistance of John Callahan, the Mayor of Bethlehem. (Id. at ¶ 13.)

Mayor Callahan and others repeatedly told Plaintiff that, as an African American, he would be playing under different rules as an employee of the Parks and Recreation Department. (Id.) Additionally, Plaintiff's union told him that the Department does not "hire blacks" and Plaintiff needed to watch out because he had a target on his back. (Id. at ¶ 14.) In fact, Johnifer McDonald, the only other African American employee in the Department, encountered so many problems during the day shift with his white coworkers that he had to move to the night shift so he could work alone. (Id. at ¶ 45.) While employed with the Department, Plaintiff worked with Wayne Weitzel ("Weitzel"), who had been accused of making racially-charged comments and was reprimanded for calling a black employee "nigger" and threatening to kill him. (Id. at ¶ 15.) Weitzel was transferred to another building and required to take anger management classes as a result of the incident. (Id. at ¶ 16.)

While working at the Parks and Recreation Department, Carp continually called Plaintiff "the Mayor's Boy" and, at one point, stated he would never have hired Plaintiff. (Id. at ¶ 22.) In June 2009, Plaintiff also overheard Carp say he did not want to hire Plaintiff but was forced to by the Mayor. (Id. at ¶ 33.) Plaintiff alleges that he was given more work than the white employees -- three floors to clean while his white coworkers had much less to clean. (Id. at ¶ 20.) Although Plaintiff would help his coworkers, none of his coworkers would help him when he asked. (Id.) Joe, a white coworker, was the only coworker who would help Plaintiff. (Id. at ¶ 21.) When Joe tried to help Plaintiff, Weitzel and Tom

Phillipi ("Phillipi") told him, "Don't f------ help him, let him do his own work." (Id.) When Weitzel saw Joe helping Plaintiff, he said, "Knock it off or I will tell Ralph [Carp] and you will get in trouble." (Id.) In contrast, Tom Phillipi, a white coworker with only one floor to clean, received help frequently, and Cyril, the only other employee with three floors to clean, was not reprimanded on occasions when he failed to complete his job. (Id. at ¶ 20.) Plaintiff could not go to Carp about the disparate work assignments because Carp was the one responsible for them. (Id. at ¶¶ 18, 19.)

Given the hostile environment, Plaintiff did not take his breaks downstairs in the office with Weitzel and Phillipi but instead chose to take his breaks in the reception area. (Id. at ¶ 23.) On February 9, 2009, Phillipi told Carp that Plaintiff took his break in the Mayor's office, implying that Plaintiff was hanging out in the Mayor's office instead of working. (Id. at ¶ 25.) Carp then told Plaintiff he was sitting in the Mayor's office on the sofa reading the newspaper, implying it was during working time. (Id.)

In April 2009, Carp singled Plaintiff out for leaving work a half-hour early even though the entire shift would leave early regularly at the direction of Phillipi without being reprimanded. (Id. at ¶ 27.) When Plaintiff told the Mayor about the incident, the Mayor responded, "Somebody has it in for you." (Id. at ¶ 28.) Similarly, in May 2009, Plaintiff had a family emergency and had to leave his shift early. (Id. at ¶ 29.) The head of his union told him that it was common practice for employees to work through their breaks and lunch in order to leave a half-hour early. (Id.) Following this advice, Plaintiff worked through his breaks and lunch so he could leave early, and because Plaintiff worked eight hours, he filled out paper work to that effect. (Id. at ¶¶ 30-31.) However, unlike his white coworkers, Plaintiff was suspended for three days for doing this, and reprimanded by Carp for poor performance. (Id. at ¶ 32.) Plaintiff was forced to sign a document under threat of termination. (Id.) When the Human Relations Director asked the union to extend Plaintiff's sixty-day probationary period, the union refused. (Id. at ¶ 34.) In contrast, white employees were observed publicly drunk, had received DUI's, and had lost their

drivers' licenses, which are violations of Defendant's Code of Ethics, yet Defendant made accommodations for these employees instead of terminating them. (Id. at ¶ 26.)

On October 6, 2009, Plaintiff took out the garbage and walked back through the police station. (Id. at ¶ 35.) While walking through the station, Plaintiff noticed candy bars on a desk which, if you took one, you were supposed to leave a dollar. (Id.) Plaintiff took a candy bar and began to eat it while he spoke to an officer. (Id.) After speaking with the officer, Plaintiff went back to his Department to get a dollar. (Id. at ¶ 35.) While he was getting the money, two white officers approached him, accused him of stealing the candy bar, and proceeded to frisk him, during which they touched his genitals. (Id. at ¶¶ 36, 37.) One of the officers, Lieutenant Sacco, told Plaintiff, "You're the guy who left early. So everybody has to sign out." (Id. at ¶ 38.) After the search, Lieutenant Sacco told Plaintiff to go back to work. (Id.) Plaintiff then returned to the station and left the dollar for the candy bar. (Id.)

The next day, on October 7, 2009, Plaintiff returned to work and a supervisor, Allen, was in the office with Bill Tone ("Tone"), the president of Plaintiff's union. (Id. at ¶ 39.) Tone informed Plaintiff that he was being sent home, although Tone disagreed with the decision. (Id.) The following day, Tone notified Plaintiff that he was on paid leave during the investigation for his alleged theft of the candy bar. (Id. at ¶ 40). Then, on October 30, 2009, Plaintiff received a letter informing him of his termination. (Id. at ¶ 42.) Plaintiff called and informed Tone of this, who had not received notice of Plaintiff's termination. (Id. at ¶ 42.) The letter stated that Plaintiff was terminated for poor performance, however, Plaintiff was never consulted by Carp or anyone else for poor performance. (Id. at ¶¶ 43- 44.) Following the termination, Tone requested that Plaintiff be sent to work at the Stefko Boulevard building but this request was denied. (Id. at ¶ 46.)

In his Amended Complaint, Plaintiff raises three counts against Defendants: 1) discrimination in violation of Title VII; 2) violation of Plaintiff's right to equal protection under the Fourteenth

Amendment pursuant to 42 U.S.C. § 1983; and 3) discrimination in violation of PHRA. Plaintiff seeks compensatory damages, backpay, frontpay, interest, attorneys fees, costs of the action, and other equitable or injunctive relief that the court finds proper. Plaintiff also seeks punitive damages in connection with his Title VII and § 1983 claims.

## II.   LEGAL STANDARD

On a motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), the court is required to accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the non-moving party. See Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F.3d 1380, 1384 (3d Cir. 1994). A complaint should be dismissed only if the alleged facts, taken as true, fail to state a claim. See In re Warfarin Sodium Antitrust Litig., 214 F.3d 395, 397-98 (3d Cir. 2000). The question is whether the claimant can prove any set of facts consistent with his or her allegations that will entitle him or her to relief, not whether that person will ultimately prevail. Scheuer v. Rhodes, 416 U.S. 232, 236 (1974), overruled on other grounds by Davis v. Scherer 468 U.S. 183 (1984); Semerenko v. Cendant Corp., 223 F.3d 165, 173 (3d Cir. 2000).

While a court will accept well-pled allegations as true for the purposes of a motion to dismiss, it will not accept bald assertions, unsupported conclusions, unwarranted inferences, or sweeping legal conclusions cast in the form of factual allegations. Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906 (3d Cir. 1997). The United States Supreme Court has recognized that "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do." Bell Atl. Corp. v. Twombly et.al., 550 U.S. 544, 555 (2007). Such allegations are "not entitled to the assumption of truth" and must be disregarded for purposes of resolving a 12(b)(6) motion to dismiss. Ashcroft v. Iqbal, 129 S. Ct. 1937,

1950 (2009). In Twombly the Court made clear that it would not require a "heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." Id. at 570. A "pleader is required to 'set forth sufficient information to outline the elements of his claim or to permit inferences to be drawn that these elements exist.'" Kost v. Kozakiewicz, 1 F.3d 176, 183 (3d Cir. 1993) (citation omitted).

In 2009 the United States Supreme Court revisited the requirements for surviving a 12(b)(6) motion to dismiss in Ashcroft v. Iqbal, 129 S. Ct. 1937, 1950 (2009). There the Court made clear that "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements" will not suffice to defeat a Rule 12(b)(6) motion to dismiss. Ashcroft, 129 S. Ct. at 1949. In evaluating whether a Plaintiff has met the pleading requirements, a district court must identify "the 'nub' of the . . . complaint -- the well-pleaded, nonconclusory factual allegation[s]." Id. "[O]nly a complaint that states a plausible claim for relief [will] survive[] a motion to dismiss." Id. at 1950.

In light of the decision in Iqbal, the Third Circuit set forth a two-part analysis to be applied by district courts when presented with a 12(b)(6) motion to dismiss. First, the court must separate the legal elements and factual allegations of the claim, with the well-pleaded facts accepted as true but the legal conclusions disregarded. Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009). Second, the court must determine whether the facts alleged in the complaint demonstrate that the plaintiff has a "plausible claim for relief." Id. at 211. If the court can only infer the mere possibility of misconduct, the complaint must be dismissed because it has alleged, but has failed to show, that the pleader is entitled to relief. Id.

### III.   DISCUSSION

   **A.   Plaintiff's Claims, Taken as True, State a Plausible Claim for Title VII Relief**

Title VII provides that "it shall be an unlawful employment practice for an employer to fail

or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . ." 42 U.S.C.A. § 2000e-2(a)(1). A plaintiff who brings a claim for hostile work environment under Title VII must prove that: 1) he suffered intentional discrimination because of his membership in a protected class; 2) the discrimination was pervasive and regular; 3) the discrimination detrimentally affected him; 4) the discrimination would have detrimentally affected a reasonable person of the same protected class in his position; and 5) there is a basis for holding the employer vicariously liable. West v. Phila. Elec. Co., 45 F.3d 744, 753 (3d Cir. 1995). A plaintiff must establish, "by the totality of the circumstances, the existence of a hostile or abusive working *environment* which is severe enough to affect the psychological stability of a minority employee." Andrews v. City of Phila., 895 F.2d 1469, 1482 (3d Cir.1990) (quoting Vance v. S. Bell Tel. and Tel. Co., 863 F.2d 1503, 1510 (11th Cir.1989)). These circumstances may include: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1081 (3d Cir. 1996) (citing Harris v. Forklift Systems, Inc., 510 U.S. 17 (1993)). However, a Title VII defendant need not "use words that overtly implicate racial animus to create a hostile work environment." Aman, 85 F.3d at 1083; Davis v. City of Newark, 285 Fed. Appx. 899, 902 (3d Cir. 2008).

In their Motion to Dismiss, Defendants argue that Plaintiff fails to meet the first and second prongs of the prima facie case for hostile work environment -- that is, Defendants argue that Plaintiff did not suffer intentional discrimination because of his race, and the discrimination was not regular and pervasive. Defendants argue that "none of the incidents described by Plaintiff could reasonably

be found to have been motivated by racial discrimination," because Plaintiff does not allege any physical threats or humiliations, or any direct utterance to him of a racial epithet or comment concerning race. Viewing the facts in the light most favorable to Plaintiff, the Court finds that this is not the case. The Court of Appeals for the Third Circuit has recognized that although "the instances in which employers and employees openly use derogatory epithets to refer to fellow employees appear to be declining . . . this in no way suggests that discrimination based upon an individual's race, gender, or age is near an end." Aman, 85 F.3d at 1081-82. Secondly, physical threats or humiliations are merely a factor, not a requirement, which courts consider in determining whether an employer has created a hostile work environment.

In this case, Carp repeatedly referred to Plaintiff as "the Mayor's Boy." (Compl. 22.) Although the term "boy" is likely to be found to have discriminatory animus when modified by a term suggesting one's race (e.g., "black boy"), such a modifier is not always necessary. The United States Supreme Court has held that the term "boy" "standing alone, is [not] always benign," and the meaning of the term "may depend on various factors including context, inflection, tone of voice, local custom, and historical usage." Ash v. Tyson Foods, Inc., 546 U.S. 454, 456 (2006) (per curiam). In the context of 1) the warnings Plaintiff received regarding the racially charged environment at the Department, and 2) the connotations of calling an adult African American man a boy given the history of race relations in this country, referring to Plaintiff as the "Mayor's boy" could reasonably be interpreted as racially motivated and indicative of discrimination. See, e.g., Bailey v. USF Holland, Inc., 526 F.3d 880, 885 (6th Cir. 2008) (explaining that the use of the term "boy" to refer to an African American employee has racially implicit connotations). In addition, Plaintiff's Complaint alleges that he was treated differently than his fellow white employees in a

number of respects, including: having more floors to clean, being prevented from receiving help to clean those floors, being reprimanded and even suspended for activities his white coworkers were permitted to do, and being subject to false accusations of taking breaks during work time. Further, to add fuel to the fire, Plaintiff also alleges that he was improperly searched by two white police officers in connection with his suspected theft of a candy bar worth only one dollar. Indeed, while any one of these allegations alone may not connote racial animus, the totality of the circumstances, taken together, help to illuminate what may otherwise appear to be ambiguous motivations behind the alleged conduct.

Viewed as a whole and in the light most favorable to Plaintiff, Plaintiff has alleged sufficient facts to support a prima facie case for hostile work environment at this early stage in the case. First, as an African American, Plaintiff is a member of a protected class. Second, the continuous differential treatment alleged by Plaintiff, coupled with the repeated racially implicit remarks, could lead a reasonable person to conclude that Defendants' conduct had a discriminatory purpose and was pervasive and regular enough to create a hostile work environment under Title VII. Third, it is apparent from the face of the complaint that the discriminatory conduct alleged detrimentally affected Plaintiff since he alleges that he was subject to false accusations, increased scrutiny compared to his white coworkers, and was ultimately discharged due to discrimination. Fourth, a reasonable person could conclude that Defendants' conduct would detrimentally affect a reasonable person in Plaintiff's position. Finally, Plaintiff alleges that Defendant Carp, the director of the Department, participated in the discriminatory treatment, which would appear to create a basis for vicarious liability. Thus, in light of Plaintiff's allegations, the Court finds that Plaintiff's claim for hostile work environment should not be dismissed as this early stage in the litigation.

### B. Defendant Carp is Not Entitled to Qualified Immunity

Defendants next argue that Defendant Carp is not subject to liability for Plaintiff's claims under § 1983 because Carp is protected by qualified immunity. Count II of Plaintiff's Complaint alleges denial of his constitutional right to equal protection in violation of 42 U.S.C. § 1983. Section 1983 liability attaches to a municipality and its officers when "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." Andrews, 895 F.2d at 1480. The doctrine of qualified immunity will protect a public official from liability under § 1983 "if [he] can show that the 'offending' conduct did not 'violate clearly established statutory or constitutional rights which a reasonable person would have known." Id. at 1479. The purpose of qualified immunity is "to protect public officials from liability in situations involving extraordinary circumstances and where they neither knew nor objectively should have known the appropriate legal standard." Id. The United States Supreme Court suggests a two-part analysis for qualified immunity claims: first, ask whether "taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?;" and second, "if a violation could be made out on a favorable view of the parties' submissions, the next sequential step is to ask whether the right was clearly established." Saucier v. Katz, 533 U.S. 194, 201 (2001). A district court may ask these questions in any order. Pearson v. Callahan, 555 U.S. 223 (2009).

Defendant Carp is not entitled to qualified immunity. Plaintiff has made out allegations that, viewed in the light most favorable to him, show that Defendant Carp, in treating Plaintiff differently than his white coworkers, violated Plaintiff's constitutional right to be free from racial discrimination. Moreover, in 2009, at the time that the allegations against Carp arose, it was

well-established law that public employers were not permitted to treat their employees differently on the basis of race. See, e.g., Andrews, 895 F.2d at 1479 (explaining that qualified immunity is not intended to protect a public official merely because a case may be "close" with regard to whether Defendants had the requisite discriminatory intent required by Title VII, and that the § 1983 proscription against employment discrimination was well-established at that point). Accordingly, the Court will not dismiss Plaintiff's claim against Defendant Carp on the basis of qualified immunity. Moreover, because Defendant Carp is not entitled to qualified immunity, the Court also rejects Defendants' argument that the § 1983 claim against the City should be dismissed because Defendant Carp is protected by qualified immunity.

    **C.**    **Plaintiff's Section 1983 Claim Should Not Be Dismissed**

Defendant argues that Plaintiff's § 1983 claim against the City of Bethlehem is barred because it is duplicative of Plaintiff's Title VII claim. In some instances, Title VII is the exclusive remedy for a plaintiff's employment discrimination claim. A plaintiff may not use § 1983 to protect a right that has been created exclusively by Title VII. See McLaughlin v. Rose Tree Media School Dist., 1 F. Supp. 2d 476, 479 (E.D. Pa. 1998).

However "the comprehensive scheme provided in Title VII does not preempt section 1983" claims when the plaintiff has a separate constitutional basis, apart from the rights created by Title VII, upon which the § 1983 claim rests. Bradley v. Pittsburgh Bd. of Educ., 913 F.2d 1064, 1079 (3d Cir. 1990); McLaughlin, 1 F. Supp. 2d at 479. That is, when a plaintiff alleges conduct that violates both the constitutional rights protected by § 1983, and the statutory rights created by Title VII, "discrimination claims may be brought under either statute, or both." Bradley, 913 F.2d at 1079 (citing Scott v. Univ. of Del., 601 F.2d 76, 79 n.2 (3d Cir. 1979)) (holding that the plaintiff could

bring both a Title VII and § 1983 claim because his race discrimination claim was grounded on the equal protection clause of the Fourteenth Amendment); see also Washington v. Dep't of Veterans Affairs, No. 98-606, 1998 WL 754464, at *3 (E.D. Pa. Oct. 28, 1998) (holding that because the plaintiff alleged both a violation of his due process rights and of his statutory rights under Title VII, he could bring both a § 1983 and Title VII claim together). Thus, even if a § 1983 claim and Title VII claim are based upon the same facts, a plaintiff may bring both claims if an independent constitutional basis exists for his § 1983 claim.

Here, a separate constitutional basis exists for Plaintiff to bring a § 1983 claim in addition to his Title VII claim. Plaintiff alleges that his constitutional right to equal protection, guaranteed by the Fourteenth Amendment, was violated because he was discriminated against on the basis of race. Thus, because there is an independent constitutional basis for Plaintiff to assert a § 1983 claim, the Court cannot preclude Plaintiff from bringing a § 1983 claim in conjunction with his Title VII claim. Therefore, Defendants are not entitled to dismissal of Plaintiff's § 1983 claim on these grounds.

### D.     Plaintiff's Claim for Punitive Damages are Dismissed

Defendant argues that Plaintiff's claims for punitive damages should be dismissed because municipalities and public officials cannot be liable for punitive damages under § 1983 or Title VII. Punitive damages are not available under Title VII when the employer is a municipality. 42 U.S.C. § 1981a(b)(1). Moreover, because Title VII only holds employers liable, individual defendants cannot be liable for any type of damages, punitive included. Udujih v. City of Phila., 513 F. Supp. 2d 350, 358 (E.D. Pa. 2007). Additionally, punitive damage claims under 42 U.S.C. § 1983 are unavailable against a defendant municipality or against individual defendants for actions taken in their official capacities. Id. Because one of the Defendants, City of Bethlehem, is a municipality, and the other

Defendant, Carp, is an individual defendant acting in his official capacity, Plaintiff will be unable to recover punitive damages against Defendants under Title VII or § 1983. Thus, Plaintiff's claim for punitive damages against Defendants are dismissed.

## IV.   CONCLUSION

For the reasons set forth herein, Defendants' Motion to Dismiss is denied with respect to Plaintiff's Title VII and § 1983 claims, but granted with respect to Plaintiff's claim for punitive damages. An appropriate Order follows.